UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 24-15 (NEB/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. IKRAM YUSUF MOHAMED,
2. SULEMAN YUSUF MOHAMED,
3. AISHA HASSAN HUSSEIN,
4. SAHRA SHARIF OSMAN,
5. SHAKUR ABDINUR ABDISALAM,
6. FADUMO MOHAMED YUSUF, and
7. GANDI YUSUF MOHAMED,
   also known as "Gandi Abdi Kediye,"

Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSES TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, Joseph H. Thompson, Harry M. Jacobs, and Daniel W. Bobier, Assistant U.S. Attorneys, respectfully submits the following consolidated responses to the defendants' pretrial motions.

## I.    Discovery Motions

### A.    Motion for Brady Material and the Scope of the Prosecution Team and Required Disclosures (Dkt. 201)

Gandi Kediye filed a Motion for Brady Material seeking an order requiring the government to produce materials in the custody, possession, and control of various state agencies. Because the Minnesota Department of Education played no part of the investigation, but instead was a subject of the investigation (and because the Minnesota Attorney General's Office is not part of the prosecution team), defendant Kediye's motion should be denied.

1

The government's disclosure obligations arise from several sources, including the Federal Rules of Criminal Procedure, the Jencks Act (18 U.S.C. § 3500), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

Rule 16 of the Federal Rules of Criminal Procedure requires prosecutors to disclose specific items including documents and data "within the government's possession, custody, or control" where:

(1) the item is material to preparing the defense;

(2) the government intends to use the item in its case-in-chief at trial; or

(3) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Under *Brady* and its progeny, a prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This requirement extends not only to materials possessed by the prosecutor but also to materials possessed by agents and agencies involved in its investigation. However, "[t]his requirement is limited to production of statements 'possessed by the prosecutorial arm of the federal government.'" *United States v. Georgiou*, 777 F.3d 125, 142 (3d Cir. 2015) (quoting *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003)). A prosecutor is not required to "discover information not in its possession or of which it was not aware." *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008); *see also United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994) ("The government has no affirmative duty to take action to discover information which it does not possess.").

2

A prosecutor is not obligated to search for material in the control of another government agency unless that agency was so closely aligned with the prosecution that it should be considered to be "part of the prosecution team" or "an arm of the prosecutor." *See, e.g.*, *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014); *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) ("As with the Jencks Act, Brady 'applies only to information possessed by the prosecutor or anyone over whom he has authority.'"); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) ("[T]he prosecution must disclose documents material to the defense (1) that it has actually reviewed, or (2) that are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the 'prosecution team.'"); *United States v. Nallani*, No. 11-20365, 2015 WL 400903, *3 (E.D. Mich. Jan. 28, 2015) (defining the "government" under Rule 16 as being limited to "the actual prosecution team, and the agency that participated in the prosecution or investigation, and substantially aided or counseled the prosecution team").

In determining whether a regulatory agency is part of the prosecution team, courts do not take a "monolithic view of government." *United States v. Connelly*, No. 1:16-cr-00370 (CM), 2017 WL 945934, *4 (S.D.N.Y. March 2, 2017) (quoting *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 n.3 (S.D.N.Y. 2006)); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) ("Courts have construed the term 'government' in this rule narrowly to mean the prosecutors in the particular case or the governmental agencies

3

jointly involved in the prosecution of the defendant, and not the 'government' in general."). Rather, courts conduct a fact-specific analysis to determine whether the level of involvement between the prosecutor and the other agency demonstrates that the agency was a "part of the prosecution team." *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007). "The key to this analysis . . . is the level of involvement between the United States Attorney's Office and the other agencies." *Connolly*, 2017 WL 945934 at *4 (quoting *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994)). "The mere fact that the Government may have requested and received documents from [another agency] in the course of its investigation does not convert the investigation into a joint one." *Connolly*, 2017 WL 945934 at *4 (quoting *Finnerty*, 411 F. Supp. 2d at 433); *see also Ferguson*, 478 F. Supp. 2d at 238 (same).

Here, the U.S. Attorney's Office in Minneapolis conducted a grand jury investigation into defendants' fraud scheme. Agents from the FBI, the IRS-Criminal Investigation Division, and the U.S. Postal Inspection Service were a part of the investigatory team. All interview reports and other discovery evidence in possession of these law enforcement agencies has been (or will be) produced during the government's ongoing discovery obligations.

MDE was not involved in the federal criminal investigation nor part of the prosecution team. An MDE employee contacted the FBI in 2021 to report suspicions that sites under the sponsorship of Feeding Our Future were submitting fraudulent Federal Child Nutrition Program claims. In the wake of the referral, the FBI and the

4

U.S. Attorney's Office opened a federal grand jury investigation. During that investigation, the government subpoenaed MDE for records related to the fraud scheme. Those records have been produced in discovery. The government also interviewed several MDE employees during its investigation. Reports of those interviews have been produced in discovery.

MDE employees were not part of the investigation or prosecution team. Indeed, far from being part of the grand jury investigation, they were subjects of it. They did not conduct interviews; they were the persons being interviewed. They did not gather evidence; they produced it (pursuant to grand jury subpoenas). The materials that the government obtained in response to those grand jury subpoenas has been produced to the defendants in the criminal case. MDE, on the other hand, has never seen or had access to these grand jury materials.

MDE has not—nor could it have—criminally investigated potential fraud by Feeding Our Future and other entities involved in the Federal Child Nutrition Program. Instead, MDE conducted its own regulatory oversight of entities involved in the Federal Child Nutrition Program as part of its role in overseeing the distribution of those funds to sites in Minnesota. Indeed, after MDE terminated certain sites under FoF's sponsorship, Feeding Our Future sued MDE, accusing them of racial animus in violation of the Minnesota Human Rights Act. MDE was represented by the Minnesota Attorney General's Office in the litigation, which similarly was not involved in the criminal investigation. During that litigation, MDE and the Attorney General's Office contacted the FBI about the potential fraud carried

out by Feeding Our Future and sites under its sponsorship. The U.S. Attorney's Office played no role in that litigation.

Because MDE did not work with the U.S. Attorney's Office, it was not part of the prosecution team in this case. Accordingly, while the prosecution must produce—and has produced—everything it received from MDE, it is not required to search through files of MDE looking for information or materials that the USAO does not possess and to which it does not have access. *United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) (holding that the prosecutor's office has no duty to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue).

In arguing otherwise, Kediye's motion misconstrues the facts and makes dubious inferential leaps. The thrust of Kediye's argument is that because the *Minnesota Attorney General's Office*—who was not part of the prosecution team—stated in a press release that it worked "side by side with MDE," MDE is part of the prosecution team. Similarly, Kediye seems to argue that because the Attorney General of the United States once thanked "law enforcement partners" in a press release, MDE somehow became part of the investigative team. The law says otherwise.

Because MDE was not part of the criminal prosecution team, Kediye's motion for an order requiring the government to obtain and produce material in MDE's possession should be denied.

**B.**     **Aisha Hussein's Motion for Discovery (Dkt. 213)**

Aisha Hussein filed a Motion to Compel Discovery, listing a litany of materials she believes the government must produce pursuant to Rule 16. The government understands, has complied with, and will continue to comply with, its discovery obligations. To the extent that Hussein's requests fall within the discovery obligations of the government, the government has already produced such material or will produce it when and if it exists. To the extent that Hussein's requests are for items not in the government's custody, possession, or control (such as "All MDE monitors documents" or "Disciplinary records for. . . Minnesota Department of Education personnel"), those documents are not within the government's discovery obligations, including for the reasons set forth above relating to the scope of the prosecution team. Accordingly, Hussein's request for discovery from those entities should be denied on the merits and otherwise denied as moot.

## II.     Defendants' Motion for Change of Venue (Dkt. 204)

Ikram Yusuf Mohamed, Suleman Yusuf Mohamed, Aisha Hassan Hussein, Sahra Sharif Osman, Shakur Abdinur Abdisalam, Fadumo Mohamed Yusuf, and Gandi Abdi Kediye moved for a change of venue to the Northern District of Illinois. Significant cases with equal or far greater publicity have been tried fairly and impartially here in Minnesota, however, including trials involving the murder of George Floyd and the massive Petters fraud scheme. Nationally, change-of-venue motions have been rejected in cases involving the Boston marathon bombing, the 1993 World Trade Center bombing, and the Enron fraud scheme. The pretrial publicity in this case—far less by orders of magnitude—has not come close to

7

upsetting the judicial process such that the defendants cannot receive a fair trial in Minnesota. This Court can and should rely on jury selection and instructions to ensure an appropriately impartial jury in the District of Minnesota. The defendants' motion should be denied.

### A.    There Is No Presumption of Prejudice Under the Facts of This Case and Transfer Would Be Inappropriate

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," amend. VI. It also secures to criminal defendants the right to trial by "an impartial jury," *id.*, and to due process of law, amend. V. Taken together, these provisions permit a change of venue only if "extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. 358, 378 (2010).

Federal Rule of Criminal Procedure 21(a) provides for changes of venue under that narrow exception:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Defendants seeking changes of venue bear the burden of proving its necessity. "The defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'" *United States v. Sabhnani*, 599 F.3d 215, 232 (2d Cir. 2010) (citations omitted); *see also Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir. 1973); *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994). As the Supreme Court has explained, pretrial publicity "does not necessarily produce prejudice, and juror

*impartiality*, we have reiterated, does not require *ignorance.*" *Skilling*, 561 U.S. at 381; *accord Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"); *Reynolds v. United States*, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.").

The decision whether a defendant has carried his burden on Rule 21(a) motion "is addressed to the sound discretion of the trial court." *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984). "Ordinarily, the key to determining the appropriateness of a change of venue is a searching voir dire." *United States v. Jacques*, No. 2:08-cr-117, 2011 WL 1706770, at *4 (D. Vt. May 4, 2011) (internal quotation marks omitted). The defendants urge the Court to ignore that avenue and, instead, to presume prejudice and to change venue on that basis. However, the presumption of prejudice only rarely applies and "attends only the extreme case." *Skilling*, 561 U.S. at 381. This is not such a case.

Here, the Court should reject the defendants' contention that pretrial prejudice will prevent them from obtaining a fair trial in the District of Minnesota—a large and diverse area with a population of over five and half million people. Their change-of-venue request ignores the Court's ability to screen the jury pool to ensure a fair and

9

impartial jury. *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986) ("[I]t was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors . . . ."). Indeed, the Supreme Court has held that it is proper to presume juror prejudice only where pretrial publicity has effectively displaced the judicial process, which has not happened here. *See Skilling*, 561 U.S. at 381-82.

The proper path forward is for the Court to determine individual juror prejudice during voir dire and ensure that a fair and impartial jury is selected in this case. *See Peters*, 791 F.3d at 1295. Given the strong public interest in prosecuting crimes in the district where they occur and the defendants' inability to show that a fair jury cannot be empaneled in a district the size of Minnesota, the defendants' motion should be denied.

The Supreme Court has presumed jury prejudice on the basis of pretrial publicity in only three cases, all of which were decided nearly 50 years ago on facts markedly different than those here: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). Wilbert Rideau was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnaping, and murder. *Rideau*, 373 U.S. at 724. Police interrogated him in jail following his arrest and filmed his confession. *Id.* On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. *Id.* In reversing Rideau's conviction, the Supreme Court explained that

10

the televised confession was "in a very real sense . . . Rideau's trial — at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726.

The trial in *Estes* was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). And in *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." 384 U.S. at 355. Each of those cases, the Supreme Court later wrote, involved "a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798.

In contrast, the Supreme Court refused to presume prejudice in *United States v. Skilling*, a prosecution involving the well-known and well-publicized Enron fraud. Instead, the Court made clear that prejudice would be presumed only under the rare circumstances that equal those of *Rideau*, *Estes*, and *Sheppard*, *i.e.,* in cases where "inflammatory pretrial publicity so permeated the community . . . that the publicity in essence displaced the judicial process." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998). The *Skilling* Court explained:

> First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In *Rideau*, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. . . . Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers

11

could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. . . . Third, unlike cases in which trial swiftly followed a widely reported crime, *e.g.*, *Rideau*, 373 U.S., at 724, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.

*Id.* at 382-83.

The circumstances of this case bear no resemblance to those of *Rideau*, *Estes*, or *Sheppard*. First, the venire here is large and diverse. According to the most recent census, Minnesota's population is 5.7 million. United States Census Bureau, https://www.census.gov/quickfacts/MN. There is no reason to doubt that twelve impartial jurors can be drawn from among those millions. *See Skilling*, 561 U.S. at 378 (venue change considerations include size and characteristics of the community). Second, the press conference and articles to which the defendants point are not of the sort that would leave indelible imprints that jurors cannot put to the side, such as a televised confession to kidnapping and murder. *See id.* (considerations also include nature of the publicity); *see United States v. Haldeman*, 559 F.2d 31, 61-62 (D.C. Cir. 1976) (holding that Watergate defendants were not entitled to change of venue because "the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession").

The defendants next argue that, even if transfer to another venue is not mandatory, this Court should nonetheless exercise its discretion to transfer this case. But the Supreme Court has repeatedly held that "even pervasive, adverse publicity

does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976); *accord Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 404 n.1 (1970) (Rehnquist, J., concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare.") (collecting cases). Even in the notorious *Sheppard* case, the Court held that, absent the "carnival atmosphere" that pervaded the trial, the "months [of] virulent publicity about Sheppard and the murder" would not have been sufficient to create a presumption of prejudice given the trial court's ability to impose measures that could have ensured a fair trial. 384 U.S. at 354-55.

Courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity." *United States v. Bliss*, 735 F.2d 294, 297-98 (8th Cir. 1984). As the Supreme Court explained in *Irvin v. Dowd*, "[i]t is not required . . . . that the jurors be totally ignorant of the facts and issues involved." 366 U.S. 717, 722 (1961). Indeed, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Id.* at 722-23. The Court emphasized that "[t]his is particularly true in criminal cases." *Id.*

As a result, "the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more" is insufficient "to rebut the presumption of a prospective juror's impartiality" and to hold otherwise "would be to establish an impossible standard." *Id.* "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*; *accord Reynolds v. United States*, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); *Drougas*, 748 F.2d at 29 ("[T]his court has previously recognized that the sixth amendment does not require that each juror's conscious mind be tabula rasa, let alone his or her subconsciousness."); *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (finding no manifest error in state court's determination that jury was impartial despite defense argument that 83% of veniremen were excused because they had prejudged the case).

Defendants suggest that a fair and impartial trial is not possible in Minnesota because of local news reporting on the case, statements by local elected officials, and postings on social media sites. Defendants' argument is entirely without merit. Defendants have pointed to a few anonymous comments posted by individuals, whose residences are unknown. Moreover, the press coverage and statements by elected officials are not divisive or inflammatory, and they do not demonstrate a need for a change of venue outside of Minnesota.

14

Measures short of transfer will easily address the defendants' concerns, as they have time and again in cases involving significantly more pretrial publicity than this case where change of venue motions were properly denied, including trials concerning:

- **the murder of George Floyd** See *State v. Chauvin*, 989 N.W.2d 1, 20 (Minn. Ct. App. 2023) ("district court took numerous steps to verify that the seated jurors would be fair and impartial, thereby mitigating any potential prejudice," and "the district court took numerous steps to prevent the trial from becoming 'utterly corrupted by press coverage[.]'"); *see also State v. Kueng*, 2021 WL 79794, at *3 (Minn. Ct. App. Jan. 11, 2021) ("[W]e are not persuaded at this point in the proceedings that the district court's order [of denying Keung's motion to change venue] violates Kueng's right to an impartial jury or his rights to due process and fundamental fairness.");

- **the Petters fraud scheme** See *United States v. Petters*, 663 F.3d 375, 385-86 (8th Cir. 2011) ("[T]he size of the jury pool would not favor a presumption of prejudice" and "only a small number of venire members had formed an opinion concerning Petters's guilt, and those individuals were excluded from the jury pool.");

- **the Boston Marathon bombing** See *In re Tsarnaev*, 780 F.3d 14, 16, 21 (1st Cir. 2015) (per curiam) (Boston is a "large, diverse metropolitan area, therefore, "residents obtain their news from a vast array of sources," and "the atmosphere [in Boston] is not to be characterized as disruptive to the

ability of the petitioner to be adjudged by a fair and impartial jury," and noting that knowledge of high-profile case from heightened media attention however, "does not equate to disqualifying prejudice");

- **the 1993 World Trade Center bombing** See *United States v. Yousef,* 327 F.3d 56, 155 (2d Cir. 2003) (the district court concluded that "a thorough voir dire of potential jurors will be sufficient in detecting and eliminating any prospective jurors prejudiced by pretrial publicity," and as the Second Circuit observed, "Yousef did not renew the motion for a change of venue after the voir dire—an indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity"); and

- **the Enron accounting fraud** See *Skilling v. United States,* 561 U.S. 358, 382 (2010) (Larger cities are likely to have a far more diverse pool of jurors, therefore, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain," and there was a "reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals").

The defendants have failed to demonstrate that pretrial publicity has displaced the judicial process. This Court can and should rely on jury selection and instructions to ensure an appropriately impartial jury. *See Yousef,* 327 F.3d at 155 ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."). And the publicity in this case comes nowhere close to that in high-profile cases that have been correctly and presumptively tried in the district

16

where the criminal conduct occurred. This Court should deny the defendants' motion for change of venue.

### III.   Motions to Sever (Dkts. 186, 197, 212)

Defendants Fadumo Yusuf, Sahra Osman, and Aisha Hussein have each filed short motions to sever their cases from that of their co-defendants. Dkts. 186, 197, 212.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 8(b) is "construed liberally in favor of joinder." *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995). The Supreme Court has repeatedly reminded federal courts that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 536 (1993); *United States v. Bordeaux*, 84 F.3d 1544, 1547 (8th Cir. 1996). As the Court has explained: "Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537. Indeed, not every defendant joined must have participated in every offense charged for joinder to be appropriate. *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996).

Here, all the co-defendants are charged with participating in the same fraudulent conspiracy. As described above, the superseding indictment alleges that they worked together to carry out the scheme.

Notwithstanding the propriety of joinder under Rule 8(b), defendants also ask the Court to sever their trials from those of their co-defendants pursuant to Rule 14 of the Federal Rules of Criminal Procedure. They argue that severance is appropriate because they would be prejudiced by "spillover" evidence relating to other co-defendants. This is not proper grounds for a severance.

The Eighth Circuit has repeatedly held that "[w]hen defendants are properly joined, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009). To overcome this presumption a defendant must show prejudice that is "severe or compelling." *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008). "It is not enough that a defendant thinks his chances for acquittal would be better in a separate trial." *Delpit*, 94 F.3d at 1143 (citing *Zafiro*, 506 U.S. at 540). To demonstrate the type of severe or compelling prejudice necessary to overcome the presumption in favor of joint trials, a defendant must show that "(a) his defense is irreconcilable with that of a co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004); *see also Lewis*, 557 F.3d at 609. Only rarely can a defendant meet that standard. *See United States v. Kirk*, 528 F.3d 1102, 1107 (8th Cir. 2008). Instead, "[t]he Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41).

18

The possibility that one defendant may attempt to point the finger at another defendant at trial is not grounds for a severance. It is not uncommon for co-defendants to blame each other at trial. The Supreme Court has held that "[m]utually antagonistic defenses are not prejudicial *per se.*" *United States v. Nichols*, 416 F.3d 811, 816 (8th Cir. 2005) (quoting *Zafiro*, 506 U.S. at 538). The Eighth Circuit has repeatedly held that such blame shifting and finger pointing is not grounds for a severance. *See, e.g., Zafiro,* 506 U.S. at 540-41 (holding that co-defendants who were accusing each other of the crime were not entitled to a severance); *Nichols*, 416 F.3d at 817 ("Blame-shifting on the part of the defendants 'is not a sufficient reason for a severance.'"); *Lewis*, 557 F.3d at 609 ("The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to 'point the finger,' to shift the blame, or to save himself at the expense of the other.").

Defendants claim severance is necessary because they will be prejudiced by "spillover" evidence. This argument fails for two reasons. First, the defendants are charged with conspiracy to commit wire fraud and are therefore responsible for the actions their co-defendants took in furtherance of the scheme. The Eighth Circuit has said "many times that it will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators." *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002). Second, the fact that the evidence may be stronger against some defendants than others is not grounds for a severance. *See, e.g., United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Severance is never warranted simply

because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased."); *Bordeaux*, 84 F.3d at 1547 ("Disparity in the weight of the evidence between the codefendants is not a sufficient reason for severance."); *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995) ("A severance, however, is not required merely because the evidence against one defendant is more damaging than the evidence against another."). This is so even where "evidence that is admissible only against some defendants may be damaging to others." *Mickelson*, 378 F.3d at 818 (citing *Blum*, 65 F.3d at 1444).

The concerns defendants raise about a joint trial are best dealt with through "careful and thorough jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41). The Eighth Circuit pattern instructions cover many of the issues raised in defendants' various motion. *See, e.g.*, 8th Circuit Model Instructions 3.08 ("Keep in mind that you must give separate consideration to the evidence about each individual defendant. Each defendant is to be treated separately . . ."); 2.14 ("You may consider some of the evidence in this case only against defendant (name); you may not consider that evidence against the other defendant[s]."). There is no reason to believe a properly instructed jury will not be able to fairly consider the evidence against each defendant, as well as each defendant's proffered defenses.

Accordingly, defendants' motions to sever should be denied.

## IV.    Kediye's Motion for Bill of Particulars (Dkt. 199)

Gandi Kediye moved for a bill of particulars. Because the indictment adequately informs the defendant of the charges against him and is legally sufficient, his motion should be denied.

The purpose of a bill of particulars is to inform a defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial. *United States v. Beasley*, 688 F.3d 523, 532 (8th Cir. 2012). A bill of particulars is not intended to provide a defendant with evidentiary detail or discovery regarding the defendant's case. *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990). Rather, it is required only when necessary to inform a defendant of the charges against him with sufficient clarity to enable him to prepare his defense, to minimize the element of surprise at trial, and to protect himself against a second prosecution for an inadequately described offense. *United States v. Wessels*, 12 F. 3d 746, 750 (8th Cir. 1993).

Rule 7 requires a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is "legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *Wessels*, 12 F. 3d at 750 (*citing United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)). An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense" with which the defendant is charged. *United*

21

*States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). As a general matter, an indictment will be held sufficient if it tracks the language of the charging statute. *Id.*

### A.    The Motion Should Be Denied Because the Indictment Contains a Detailed Description of the Charged Crimes

At the outset, the indictment in this case tracks the language of the charging statutes. In doing so, the indictment informs the defendants of the nature of the charges against them and provides them the opportunity to prepare a defense at trial. On that basis alone, the indictment is legally sufficient and the motions for a bill of particulars should be denied. *See United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment is normally sufficient if its language tracks the statutory language.").

But the indictment in this case goes far beyond what is legally required. The indictment charges Kediye with conspiracy, wire fraud, and money laundering. The indictment is lengthy and detailed. It alleges that the defendants "devised and carried out a massive scheme to defraud the federal child nutrition program," and to have "obtained, misappropriated, and laundered millions of dollars in program funds that were intended as reimbursements for the cost of serving meals to children." And the indictment explains Kediye's specific role. It details, among other things that Kediye: (i) created GAK Properties and GIF Properties as money laundering entities for use in the scheme, (ii) used both entities for that purpose; (iii) received via GAK Properties more than $800,000 in taxpayer-funded food-program funds in less than a year and a half from Suleman Mohamed and Star Distribution; (iv) received via GIF Properties about $370,000 additional food-program funds from Suleman Mohamed

22

and Star Distribution, and still more such funds from companies run by his conspirators, including United Youth and Inspiring Youth; (v) submitted fraudulent meal counts to Feeding Our Future for his conspirators' companies that ran fake food sites, like United Youth, Inspiring Youth, and Youth International Club; (vi) made purchases and transfers from his money laundering entities as part of the conspiracy, including to buy real estate. Dkt. 235 ¶¶ 83-86, 94 (Counts 19-21), 112 (Counts 30, 31, 34, 36).

### B.    The Motion Should Be Denied Because a Bill of Particulars Is Not a Discovery Device

As explained above, the Eighth Circuit has repeatedly held that "[a] bill of particulars is not to be used for discovery purposes." *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1979). Yet discovery is exactly what Kediye seeks. His motion broadly requests evidence of knowledge and intent—precisely the type of evidence the government will offer at trial.

A bill of particulars "is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011) (quoting *United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir 2009)); *see also United States v. Thao*, Crim. No. 21-108(2) (PAM/TNL), 2021 WL 5564521, at *7 (D. Minn. Nov. 29, 2021) ("To the extent Defendant seeks evidence the Government intends to introduce at trial, 'a Bill of Particulars is not intended to be a substitute for discovery, nor is it designed to provide information which the Defendant might regard as generally helpful, but which is not essential to his defense.'"); *United States v. Morales*, 19 CR

281, 2020 WL 4043953, at *2 (D. Minn. March 20, 2020) ("The 'whens wheres and with whoms of acts and participation in the charged conspiracy' is not properly the function of a bill of particulars."); *United States v. Afremov*, Crim. No. 06-196 (JRT/TNL), 2007 WL 2475972, at *2 (D. Minn. Aug. 27, 2007) ("[A] bill of particulars is not intended to supplement discovery or to provide for the acquisition of evidentiary detail.").

Courts in this district have routinely denied these sorts of requests. In *United States v. Belfrey*, for example, the district court affirmed the magistrate judge's denial of the defendants' motions for a bill of particulars in a health care and tax fraud case. 2016 WL 1301085, at *3 (D. Minn. Apr. 1, 2016). The defendants sought answers to a laundry list of questions:

> (1) the manner and means by which each defendant failed to truthfully account for withheld taxes; (2) the obligation for accounting and paying withheld taxes for entities in which a particular defendant held no interest; (3) the means and manner in which each defendant violated 42 U.S.C. § 1320a-7(i)(3); (4) identification of the law which criminalizes [defendant 1's] concealment of his association with Model Health Care or Integrated; (5) the manner and means of [Defendant's 1's] concealment of his association with Model Health Care or Integrated; (6) the manner and means by which [Defendant 2] cooperated in [Defendant 1's] concealment of his association with Model Health Care or Integrated; (7) the manner and means by which [Defendant 2] participated in naming the owner of Model; and (8) details regarding [Defendant 1] being an alleged manager or owner of Integrated.

*Id.* at *1. The district court denied the motions, stating, "With respect to the health care fraud allegations, the Indictment identifies by name the businesses through which Defendants allegedly obtained reimbursements from Medicaid in violation of [Defendant 1's] 2004 exclusion order." *Id.* at *3. The district court found that this was

24

25

"enough information to adequately inform Defendants of the charges against them to enable the preparation of a defense and avoid surprise at trial." *Id.*

Ultimately, Kediye's arguments fail because the purpose of a bill of particulars is to inform the defendants of the nature of the charges against them, not to provide a detailed preview of the government's proof at trial. *See Afremov*, 2007 WL 24759722 at *2 ("In short, the prosecution's production of documents does not require a bill of particulars because the Superseding Indictment adequately informs the defendants of the precise charges against them."). Because the "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir. 1982), these requests should be denied. *See, e.g.*, *United States v. Petters*, Crim. No. 08-364 (RHK/AJB), 2009 WL 1076199, at *4 (D. Minn. March 26, 2009) (denying motion for bill of particulars seeking, among other things, identification of co-conspirators, victims, and losses).

The indictment in this case is more than sufficiently detailed to allow defendant to prepare his defense, and it has been supplemented by voluminous disclosures that have gone well beyond what the government is legally obligated to provide. The indictment not only contains language that tracks the statutory elements of the offenses charged, but also provides extensive details regarding the criminal conduct alleged to form the basis of those charges, which more than adequately address the questions posed by the defendants' respective motions.

For these reasons, the defendant's motion for a bill of particulars should be denied.

25

## V.    The Motions to Suppress Search Warrant Evidence

Defendants Ikram Yusuf Mohamed, Suleman Yusuf Mohamed, Aisha Hassan Hussein, and Gandi Kediye filed, adopted, or joined in substantially identical motions to suppress evidence obtained via an email search warrant. Dkts. 188, 207, 208, 214, 223. Shakur Abdisalam submitted his own motion, also seeking suppression of email evidence. Dkt. 193.

The defendants all take issue with the email affidavits,[1] insisting that they fail on their face for lack of probable cause. Beyond generally claiming that the affidavits lack probable cause, they argue: the facts ascribed to informant Hadith Ahmed should be summarily discredited; and the averments concerning Star Distribution (the vendor nominally owned by Suleman Mohamed and whose bogus invoices substantiated the food-program claims of Aisha Hussein, Sahra Osman, Shakur Abdisalam, and Fadumo Yusuf, and which engaged in significant financial transactions with companies controlled by Gandi Yusuf) do not support probable cause.

Evidence should be suppressed only when the defendant can prove it was obtained in violation of his Fourth Amendment rights. *See United States v. Bennett*, 972 F.3d 966, 971 (8th Cir. 2020). Such proof requires a showing that: (i) a Fourth Amendment violation occurred; and (ii) such violation was the but for-cause of law enforcement obtaining the challenged evidence. *See United States v. Class*, 883 F.3d

---

[1] The defendants challenge two email warrants, but they are identical apart from the final descriptions in each relating to the respective, particular emails to be searched. Dkt.189-1 (23-mj-416 (ECW)); Dkt.194-1 (23-mj-415 (ECW)).

734, 738 (8th Cir. 2018). Still, even when a violation occurs, suppression is not appropriate where the executing officers acted in objectively reasonable reliance on the warrant. *United States v. Leon,* 468 U.S. 897, 922 (1984).

A search warrant is supported by probable cause if, "based on the totality of the circumstances set forth in the application and affidavits, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Johnson*, 528 F.3d 575, 579 (8th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant[.]" *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (cleaned up). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a substantial basis … for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39 (cleaned up).

### A. The Affidavit More Than Supplies Probable Cause to Believe Each of the Defendants Engaged in a Scheme to Defraud and Used Their Emails to Further That Scheme

The affidavit begins by detailing the basis for the investigation's belief of extensive fraud at Feeding Our Future. It explains, starting in April 2020, how FoF's activity in the Federal Child Nutrition Program exploded, growing from approximately $3.4 million in disbursed funds in 2019 to about $200 million just two years later. Dkt. 194-1 ¶ 18. It explains one of FoF and Aimee Bock's motivations for so expanding: the greater the number of sites under its sponsorship and the claims submitted by those sites, the greater FoF's entitlement to administrative fees. FoF, the affidavit explains, claimed nearly $18 million in admin fees from the FNCP—

27

which, again, was a *reimbursement* program meant to feed needy children—in 2021 alone. *Id.* ¶¶ 19-20. The affidavit explains that Bock and her employee were indicted in 2022 for soliciting and receiving kickbacks from sites operating under FOF. *See id.* ¶¶ 21-24.

The defendants argue the affidavit's description of kickbacks is "conclusory." The affidavit defeats that claim. It explains that the investigation's understanding of the role of kickbacks in the scheme under investigation was substantiated by, among other things, review of bank records, *e.g.*, *id.* ¶¶ 23-24; cooperator Hadith Ahmed's sworn admissions, upon entering a guilty plea, that while working at FoF he accepted kickbacks from sites under FoF sponsorship and that he used a shell company to receive and conceal those payments; and Ahmed's report that Ikram, while working at FoF, did the same and created false documents to substantiate false claims, *id.* ¶¶ 27-28.

Here the defendants object that Ahmed's information is an "unsupported accusation" that must be rejected out of hand. *E.g.*, Dkt. 188 at 3-4. Again, the affidavit contradicts the defendants' argument. It provides extensive additional facts that support Ahmed's description of kickbacks at Feeding Our Future. The affidavit describes, for example, that: (i) FoF records and reports from other FoF employees confirm that Ikram Mohamed worked at FoF, 194-1 ¶ 30; (ii) FoF employees disguised some of the kickbacks they received as "consulting" fees, *id.* ¶ 21; (iii) coincident with the height of the Feeding Our Future fraud, Ikram Mohamed created a consulting company for herself called IM Consultation LLC, *see id.* ¶¶ 18, 31; and large and

28

repeated payments funded by food-program money flowed from sites under FoF's supervision to Ikram Mohamed's IM Consultation, *e.g.*, *id.* ¶¶ 45, 55, 65, 83. These and other facts in the affidavit—to say nothing of the reasonable inferences drawable from those facts—substantiate Ahmed's reports and, in all events, independently provide a substantial basis to believe that Ikram Mohamed solicited and was paid kickbacks. *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (evaluating informant report is a totality inquiry); *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (probable cause finding may rely on reasonable inferences).

Next the affidavit provides a catalogue of inculpatory facts related to the defendants' particular companies. Those facts begin with a chronology detailing the defendants' creation of those companies (namely United Youth of MPLS, owned by Aisha Hussein; Youth International Club, owned by Sahra Osman; Inspiring Youth & Out Reach, owned by Shakur Abdisalam; Active Minds Youth, owned by Fadumo Yusuf; and Star Distribution, owned by Suleman Mohamed) Dkt. 194-1 ¶ 32. Second, the affidavit explains that each of those companies operated one or more food sites under Feeding Our Future—whose operations the affidavit has by now extensively demonstrated to be likely fraudulent—and that those companies' sites operated similarly to one another, including by submitting similarly unbelievable claims for program reimbursement.

Then, for each defendant-run company, the affidavit identifies or provides: (i) examples of meal counts signed by the defendants and purporting to claim thousands of daily meals to children (as when United Youth claimed over 5,200 daily meals,

29

*id.* ¶ 20); (ii) the total payment amount from FoF, which ranged for these companies from about $1 million to about $2.3 million;[2] (iii) explanation that, including from review of bank records, the investigation determined that the millions of dollars flowing into those defendant-owned, site-operating companies largely was not spent on food but rather funneled among defendant-controlled accounts and spent by the defendants; and (iv) evidence that each defendant-owned company paid significant sums to Ikram Mohamed and/or to her consulting company, IM Consultation.

The defendants object to the affidavit's description of the financials—especially the substantial sums paid to Star Distribution by the defendant-run food sites. Because once more, the averments more than provide a substantial basis to believe fraudulent activity had occurred, these objections too can be rejected. The affidavit extensively describes what the investigation revealed Star Distribution did and did not do and how it was integrally tied in to the operations of each of the defendants.

Star Distribution was incorporated by Suleman Mohamed, using an email address (gandimohamed@gmail.com) apparently associated with defendant Gandi Kediye (also known as Gandi Mohemed). Dkt. 189-1 ¶ 86. Suleman then opened the company bank account and in little over two years received more than $10 million, principally from the food program. *Id.* ¶ 88. Account analysis did not show significant payments to legitimate food suppliers. Nor did investigation reveal any large food-

---

[2] Indeed, for at least United Youth and Youth International, the affidavit includes explanation from review of bank records that those payments represent virtually all of the money coming into each of those companies' bank accounts (signaling that those companies had no business operations aside from profiting from the reimbursement-based food program).

distribution operations. Rather, the affidavit explains that Star Distribution was registered first to a residential address and then to a business suite whose owner reported having never heard of Star nor Suleman Mohamed. For these reasons and others, the affidavit explains, the evidence indicated that Star was not actually in the business of large-scale food procurement and distribution but rather was what its financials suggested: a shell company used to launder fraud proceeds. *Id.* ¶¶ 88-90.

Despite all this, defendants complain that the affidavit summarily sets aside payments from Star Distribution to what defendants say could have been other, legitimate food vendors: Afro Produce and Afrique Hospitality Group. But the affidavit explains the investigation's finding that Afro Produce invoices were not legitimate but were *purchased* and then only minimal food was delivered. *Id.* ¶ 93. As for Afrique, the affidavit explains that its CEO was indicted for participating in the food program fraud and that Afrique engaged in extensive money transfers—funded with food-program payments—with companies owned by the defendants and with Ikram Mohamed herself. *See id.* ¶ 94. One of those transfers was a payment of a quarter million dollars in food-program funds *from* Afrique *to* Ikram. *Id.* The accounting revealed that Ikram spent those funds down rapidly, at a rate of about $20,000/month, on personal spending. *Id.* ¶ 96. If Afrique were a legitimate food vendor, funds would flow from Ikram-controlled or -associated entities, like Star Distribution (purportedly purchasing food from Afrique) or the defendant-run, site-operating companies (purportedly purchasing food from Afrique by way of Star Distribution) to Afrique. Instead, as this $250,000 example in the affidavit shows,

31

analysis shows significant funds traveling in both directions. That is because Afrique was not a legitimate food vendor, but, as detailed in the affidavit, a money laundering entity used in furtherance of the scheme.

So, defendants are wrong to say that the affidavit provides less than a substantial basis to believe Star Distribution was engaged in fraud and was part of the scheme then under investigation (and since charged). But, more than that, the defendants do not even make mention of the several *other* bogus food vendors used by defendants' sites described in the affidavit. They do not mention "vendor" Dua Supplies & Distribution Inc., whose owner was charged with money laundering in the food program scheme. As the affidavit explains, at least 85% of the funds paid from Active Minds Youth (Fadumo Mohamed's company) to Dua did *not* go toward food, but rather into Ikram Mohamed's pocket. *Id.* ¶¶ 79-82. Nor do they mention[3] a company called The Produce, whose operator was indicted for defrauding the food program. *Id.* ¶ 68.

Ultimately, the defendants roundly claim the affidavit is so conclusorily done that is cannot establish any basis to believe that they were "involved in any fraud." *E.g.*, Dkt. 188 at 5. The extensive detail in the affidavit, as recounted just in part above, disproves that claim.

Finally, the affidavit details examples of how each of the email accounts was used to communicate with Feeding Our Future and/or to submit reimbursement claims to that sponsor. Of the defendants, only Shakur Abdisalam argues that the

---

[3] Abdisalam's motion makes passing mention of The Produce.

affidavit failed to establish probable cause to believe not only that fraud occurred, but that evidence of such fraud would be found in his email records. The government explains immediately below why that nexus argument should be rejected. Had the other defendants raised nexus challenges of their own, they would fail for reasons parallel to those below.

### B. Shakur Abdisalam's Challenges to Nexus and Overbreadth Should Be Rejected

Shakur Abdisalam argues that the affidavit fails to establish a nexus between criminal activity and his email account, inspiringyouthoutreach@gmail.com,[4] and he argued overbreadth. Both arguments should be rejected.

To be approved, a warrant application must provide "evidence of a nexus" between the fruits, instrumentalities, or evidence sought and "the place to be searched." *United States v. Jones*, 74 F.4th 941, 948 (8th Cir. 2023). "Factors to consider in determining if a nexus exists include the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *Id.*

"The Fourth Amendment's particularity requirement is a standard of practical accuracy rather than a hypertechnical one." *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022). In evaluating particularity, courts consider "the purpose for

---

[4] None of the other defendants argue lack of nexus between criminal activity and their email accounts. For good reason. The affidavits detail that nexus extensively. *See* Dkt. 189-1 ¶¶ 35, 98-104 (Ikram Mohamed's email, amaden2@yahoo.com); Dkt. 194-1 ¶¶ 98-113 (Aisha Hussein's email, unitedyouthofmpls@gmail.com); *id.* Suleman Mohamed's email, stardistribution19@gmail.com).

33

which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Id.* (cleaned up).

The affidavit includes several examples of Abdisalam's email account being used in connection with his participation in the food program, including: (i) inclusion as the company email on an FoF authorization form; (ii) submission to Feeding Our Future, in an email signed by Abdisalam, of meal counts, signed by Abdisalam, for an Inspiring Youth site (the company in Abdisalam's name); and (iii) a second submission to Feeding Our Future, months later, again containing meal counts for the same site. Though not necessary to overcome the low bar of probable cause, the affidavit also makes clear that Abdisalam used that email to exchange more communications with FoF than just those examples. Dkt. 194-1 ¶¶ 111-13.

Abdisalam also contends the email warrant is unconstitutionally overbroad because it allowed the government to obtain records dating back to January 2020 even though the particular examples of that account's use included in the affidavit are dated between February and July 2021. Dkt. 194 at 13. He says that the government did not need to seek a broader date range of records to "get at those limited communications." *Id.* Of course, the government sought in this warrant, and had probable cause to obtain, records related to (and discussions concerning) that account that spanned any preparation that went into Abdisalam and his conspirators' efforts to open the company, set up its accounts, and prepare it to join the food nutrition program. (After all, if the Abdisalam-run Inspiring Youth site was actually providing meals on the order of magnitude it claimed, it would have had to undertake

34

significant prep work in advance of February 2021, when he applied with Amy Bock to enroll in the program. That same month, Abdisalam was already claiming to feed over 2,400 meals to kids daily at his site. Dkt. 194-1 at 50-52.)

Even assuming *arguendo* that a defect arose from the warrant's range slightly exceeding the particular examples provided of the account's usage, the warrant still would have been sustained by good faith.

## C. Even If the Warrants Had Been Deficient, They Still Would Be Sustained by Good Faith

Even where a search warrant is later held to be invalid, suppression is still not appropriate so long as law enforcement relied upon the warrant in good faith. *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011) (citing *United States v. Leon*, 468 U.S. 897, 900, 922–23 (1984)). Good faith preserves warrants except where they are so lacking in indicia of probable cause as to render official belief in its existence *"entirely unreasonable." United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007). That is because "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 486 U.S. at 921.

Here, the affidavit was reviewed and approved by a neutral and detached judge. Even if any of the objections defendants raise amounted to a constitutional defect—and none does—none of those purported issues so upsets the case for probable cause as to render agents' reliance on the Court's approval "entirely unreasonable."

## VI. The Defendants Fail to Carry Their Burden to Merits a *Franks* Hearing

Defendants Ikram Yusuf Mohamed, Suleman Yusuf Mohamed, Aisha Hassan Hussein, Shakur Abdisalam, and Gandi Kediye filed, adopted, or joined in substantially similar motions seeking a hearing under *Franks v. Delaware*, 438 U.S. 152 (1978). Dkts. 188, 193, 207, 208, 214, 223. Defendants do not come close to carrying the burden they bear to merit a hearing, however, so the Court should deny their motions.

To merit a *Franks* hearing, the defendant must show, first, that "a false statement knowing and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). That requirement "is not lightly met," *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010), meaning that a *Franks* hearing "must be denied" unless the defendant "makes a strong initial showing of deliberate falsehood or reckless disregard of the truth," *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (cleaned up). "[M]ere allegations" of deliberate or reckless falsehoods are insufficient. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (citation omitted). So are showings of negligence or innocent mistake. *Franks*, 438 U.S. at 171; *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). Rather, to satisfy the first *Franks* requirement, a defendant must show that "the affiant ... entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995); *Arnold*, 725

F.3d at 898 (challenges to purported omissions not sufficient absent showing of "deliberate or reckless falsehood"). And the Eighth Circuit instructs "[r]arely will an unintentional omission be grounds for *Franks v. Delaware* relief when complex economic crimes are the subject of the investigation." *United States v. Ozar*, 50 F.3d 1440, 1445-46 (8th Cir. 1995). Instead, in complex cases like the one at bar, absent an outright lie, the motion "should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known." *Id.*

Second, if a defendant makes a substantial showing of a knowingly false statement "intended to mislead," he must also show that, "if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *Arnold*, 725 F.3d at 898. Where the defendant complains not of inaccurate statements in the affidavit but of omissions of purportedly material information, the defendant must show that the inclusion of such information "would have *negated* probable cause." *United States v. Finley*, 612 F.3d 998, 1003 (8th Cir. 2010).

In the motions at bar, the defendants argue that the search warrant affidavit failed to fully explain aspects of the Federal Child Nutrition Program and such failures render the warrant invalid. In defendants' view, the affidavit did not sufficiently explain: that Star Distribution was "entitled to profit"; their assertion that Star Distribution bought a lot of real food; that, they say, their massive and consistent food-distribution claims can be explained by certain COVID-era program

37

waivers; and that the government had in its possession at the time the warrant was signed some videos in the terabytes of data seized in this case that would, if described in the affidavit, have so undermined all the other extensive evidence of fraud as to "negate" probable cause. Each of these arguments fails and the motion should be rejected.

First, defendants contend the affidavit wrongly suggests that Star Distribution was not free to make the profit from its participation in the food program. *E.g.*, Dkt. 194 at 27-28. This misses the mark. The defendants are not charged with making excessive profits from the food program. They are charged with fraud, money laundering, and (in Ikram Mohamed's case) kickback conspiracy. Specifically, they are charged with fraudulently claiming that they fed meals to thousands of children a day, which resulted in them receiving more than $13 million in tax-funded program funds. They are charged with creating and using a series of shell companies to receive and launder the proceeds of their fraud scheme. And Ikram Mohamed is charged with conspiring to pay and receive kickbacks in exchange for Feeding Our Future's continued sponsorship of multiple companies' fraudulent participation in the program. The affidavit did not seek access to the defendants' emails on the basis of Star's supposed profits, but rather on the extensive investigative findings that Star did not buy anywhere near the quantities of food its invoices claimed and that it instead operated as a sham vendor and money laundering vehicle for the conspiracy's food site companies. The affidavit is clear about the role Star Distribution played here; there is nothing materially misleading about its presentation.

Next, defendants argue that Star Distribution actually bought a lot of real food and that the meal counts they signed—when considered in light of certain COVID-era waivers governing the food program—properly and reasonably documented it. They acknowledge that the affidavit recognized the existence of those program waivers, *e.g.*, Dkt. 194 at 22, but they argue it intentionally omitted additional details about those waivers that appear to form the basis of the defendants' trial defense. This argument likewise is off base. A *Franks* hearing is not a motion for summary judgment, nor can *Franks* hearings be used to force the government to prove its trial evidence in a pretrial setting. Once more, defendants present a trial defense instead of any showing of knowing, material falsity in or omission from the affidavit.

The defendants argue those waivers, stacked together, permitted the type of en masse distributions they claimed they made. That isn't so—as the trial evidence will prove—but in all events this is for present purposes immaterial. None of the additional provisions about the waivers cited in the defendants' motions authorized the submission of false claims, the creation of fake paperwork, or the payment of kickbacks. Regardless of whatever waivers were in place, federal criminal statutes prohibited the defendants' submission of fraudulent claims to obtain federal funds— which the affidavit extensively detailed. And regardless of what program rules required or allowed, *defendants' sites simply did not provide the quantity of food they claimed*. The affidavit explains why the investigation then believed (as it has since conclusively determined and at trial will prove) that the defendants' meal counts were massively inflated: the defendants did not make the food purchases (as shown by the

39

financials) nor have the procurement infrastructure (as shown by reports from Star Distribution's landlord) necessary to support them. *See supra* at Part V.A.1 (affidavit's discussion of financial analysis and substantial basis to believe Star Distribution did not make significant food purchases, including from Afrique Hospitality Group and Afro Produce). At trial the defense can try to present evidence to the contrary; but their belief that they can do so is not grounds for a *Franks* hearing.

Finally, defendants maintain that because Ikram Mohamed now says that, during the defendants' activity in the food program, she texted Aimee Bock some unspecified number of videos "to show her the activity at the sites," and because law enforcement later seized one of Bock's phones, the government had those videos in its possession and so the affiant should have described them. This comes nowhere close to the type of deliberate and material omission defendants must identify to warrant a hearing. First, they supply zero basis to believe this supposed omission was knowing. The government seized nearly 200 devices in the Feeding Our Future investigation whose collective contents are nearly 8TB in size. Bock's phone was just one of those. In an investigation of this magnitude, many of the seized devices (to say nothing of the 3,500 bank subpoena returns) were not exhaustively analyzed until necessary. (In the case of the devices most directly associated with Bock and the conspirators charged in her indictment, many were not so analyzed until the weeks prior to her trial, in February 2025.) *See Ozar*, 50 F.3d at 1445-46 (in complex white collar cases, evaluation of *Franks* motions turns on the affidavit's contents, not on

40

what defendants "assert with the benefit of hindsight the government should have known"). Defendants bear a threshold burden to show the affiant deliberately withheld information; they cannot and do not do so.

What is more, now that Bock's device has been extensively analyzed, the government has not found the evidence the defendants insist is there: the type of extensive and consistent video evidence that would substantiate claims of thousands and thousands and thousands of daily meals to children being provided from the defendants' food sites. The evidence doesn't exist and the affiant did not lie about it.

But even to the extent *some* evidence exists on that phone or anywhere else of *some* food being distributed, it still does not change the outcome. Defendants are not accused of (nor were under investigation for) pocketing 100% of the food-program pay-outs nor making 0 legitimate food purchases. They are charged with, and described in the affidavit to have been engaged in, flagrant claim inflation. Given the extensive evidence of as much presented in the affidavit, inclusion of some limited depictions of occasional food distribution—which is all the evidence that exists—would not have "negated" probable cause. Moreover, even if any such omitted information could have been material to the probable cause determination, the defendants still bear the burden of showing now, before a hearing, that the affiant knew such information at the time and deliberately omitted it for the purpose of misleading the Magistrate Judge. They have presented no such evidence because there is no such evidence.

Defendants cannot meet their burden under *Franks* and their request for a hearing should be denied.

41

## CONCLUSION

The government respectfully requests that the Court deny the defendants' motions for the reasons set out above.

Date: January 11, 2026                    Respectfully submitted,

                                          DANIEL N. ROSEN
                                          United States Attorney


                                     BY:  /s/ *Joseph H. Thompson*
                                          JOSEPH H. THOMPSON
                                          HARRY M. JACOBS
                                          DANIEL W. BOBIER
                                          Assistant U.S. Attorneys